IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CRITICAL PROJECT SERVICES, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>BRADLEY GRAY and WORLDWIDE<br>MISSION CRITICAL, LLC,<br><br>                    Defendants. | **COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Critical Project Services, LLC ("Plaintiff" or "CPS"), by and through its attorneys Kelley Drye & Warren LLP, as and for its Complaint against Defendants Bradley Gray ("Gray") and Worldwide Mission Critical, LLC ("WMC") (collectively, "Defendants"), alleges as follows.

## <u>NATURE OF THE ACTION</u>

1.      This is an action to recover damages and for injunctive relief based on Defendants' brazen theft and use of confidential, proprietary, and trade secret information belonging to CPS.  While employed by CPS, Defendant Gray decided to open WMC, a business whose purpose is to compete with CPS by providing the same services CPS provides to CPS's existing customers and prospects using CPS business information.

2.      Rather than simply resigning his position with CPS so that he could compete fairly and honestly, Gray recognized the significant challenges he would face in starting a successful venture from scratch.  As a result, Gray decided to use his position within CPS, which provided him with access to CPS's confidential, propriety and trade secret business information to steal that information for the benefit of his competing business.

3.      In furtherance of his plan, Gray set about the wholesale copying of vast amounts of CPS's electronic data, including information on current and former CPS engagements, CPS business development and pipeline documents, CPS customer pricing information, and CPS intellectual property concerning the design of data centers developed by CPS at substantial expense.  Gray has since used that stolen information for his benefit and for the benefit of WMC to poach CPS customers and otherwise unfairly compete with CPS.

4.      When CPS discovered some of Gray's illegal conduct, CPS sought to recover its stolen information, but despite numerous efforts to do so, Gray has refused to fully cooperate, and indeed, upon information and belief, still has possession of and is using CPS's business information for his and WMC's benefit.

5.      Moreover, and in addition to his theft, Gray while still employed by CPS (i) charged CPS for purported business expenses, including travel, that was related to his new competing venture; (ii) solicited CPS employees for the purpose of gaining access to confidential and proprietary CPS information that these employees would be able to use – albeit unlawfully – to give WMC a competitive advantage in the marketplace; and (iii) during his working hours at CPS took affirmative and deliberate steps to obtain business for WMC for existing and prospective customers of CPS.

6.      Defendants' actions, as detailed in this Complaint, constitute, among other things, theft of trade secrets, tortious interference with contract and unfair trade practices.   Gray also violated his fiduciary obligations to CPS by misappropriating highly confidential and trade secret information while employed by CPS, and is liable for conversion for his use of CPS resources for his own benefit.

7.      CPS seeks damages to make it whole for the losses it has suffered as a result of Defendants' conduct and a permanent injunction preventing Defendants from continuing their improper use of CPS's highly confidential, proprietary and trade secret information.

## THE PARTIES

8.      Plaintiff CPS is a limited liability company ("LLC") organized under the laws of the State of Texas with its principal place of business located at 17000 Dallas Parkway Suite 104 Dallas, Texas 75248.

9.      Upon information and belief, Defendant Gray is a resident of Virginia with an address at 21022 Roaming Shores Terrace, Ashburn, Virginia 20147.

10.     Upon information and belief, Defendant WMC is a LLC organized under the laws of the State of Virginia with its principal place of business located at 21022 Roaming Shores Terrace, Ashburn, Virginia 20147.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this dispute arises by virtue of Defendants' violations of, *inter alia*, 15 U.S.C § 1125(a) and 18 U.S.C. § 1836, *et seq*. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants are subject to the personal jurisdiction of this Court, or in the alternative, because a substantial part of the events giving rise to this dispute occurred within this district.

13.     Venue is proper in this division because the events giving rise to this dispute occurred in the division.

## FACTS

**A.**     **CPS's Business**

14.     CPS was established in 2009.   It is an industry leader in designing data centers. It provides unique expertise on the design-build approach for retrofitting existing buildings and/or building new data centers by painstakingly assessing a variety of factors.   These factors include environmental conditions, site access, utility availability, and a range of other risk assessments.   CPS also is a full-service consulting program management firm dedicated to managing projects for clients by, among other things, integrating with the clients' internal staff to manage projects effectively and efficiently.   In addition to its headquarters in Dallas, Texas, CPS has offices in Houston, TX, Chicago, IL, Dubai UAE, San Francisco, CA and London, UK.

15.     CPS has clients throughout the world, specializing in a variety of sectors that require data centers.

16.     The identity of CPS's customers, confidential information regarding CPS's customers, information regarding customer pricing for CPS's services, and CPS's internal strategies and construction designs to implement data construction projects, constitute highly confidential and proprietary business information which qualify as trade secrets as defined by The Defend Trade Secrets Act, 18 U.S.C. § 1839(3) and the Va. Code Ann. § 59.1-336.

**B.**     **Gray's Misconduct in Violation of CPS's Rights**

17.     Gray was hired by CPS in or around August of 2016, as a Senior Manager.

18.     As part of his employment, Gray routinely received confidential, proprietary and trade secret business information from CPS including, but not limited to, customer lists, price lists, current and prospective engagement letters, and design plans for data construction projects.

19.     As a Senior Manager at CPS, Gray's job duties and responsibilities, among other things, included:

- Communicating with existing customers concerning project management services;

- Participating in management meetings where strategic and commercial strategies were formulated;

- Participating in CPS's business development efforts; and

- Participating in meetings concerning the design and implementation of data construction projects.

20.     Unbeknownst to CPS, at some point in 2018, Gray formulated a plan to found a business to compete with CPS.  That business would become known as WMC.

21.     In or around October, 2018, Gray approached a CPS employee, Kevin Dessecker at his project site and during business hours.  At the time, Gray informed Mr. Dessecker that he planned to resign from CPS and would be starting a new competing business.  Gray asked Mr. Dessecker to join him at WMC.  Gray also asked Mr. Dessecker about the likelihood that he could retain a large client of CPS if he came to WMC.  Mr. Dessecker refused Gray's overtures.

22.     At the same time that Gray was soliciting Mr. Dessecker, and while he was working at CPS, Gray solicited other CPS employees to join him at WMC, with the same aim as his solicitations of Mr. Dessecker:  to obtain CPS customers and/or confidential, proprietary or trade secret information.  These solicitations occurred during CPS work hours and in certain cases through the use of CPS financial resources which allowed Gray to travel throughout the country on behalf of CPS but during which he was furthering the business interests of WMC.

23.     Gray was successful in recruiting CPS employee, Charlie Scott, to join him at WMC.  Mr. Scott was an Executive Vice President at CPS in charge of business development for

CPS.  In that role, Mr. Scott was privy to a wide range of confidential, proprietary and trade secret information related to CPS's customers, prospects and strategic plans.

24.     In addition to his efforts to recruit CPS employees to work for WMC, while Gray was working for CPS, upon information and belief, he engaged in purported CPS business travel, for which he was reimbursed by CPS, but whose purpose was to allow Gray to meet with and solicit customers on behalf of WMC.  Indeed, even after Gray was terminated, upon information and belief, he used plane tickets purchased by CPS to further the business interests of WMC.

**C.     Rather than Build WMC from Scratch, Gray Misappropriated CPS's Confidential, Proprietary and Trade Secret Information**

25.     In addition to his improper solicitation of CPS employees and his misappropriation of CPS funds for the benefit of WMC, unbeknownst to CPS at the time, during his employment, Gray surreptitiously misappropriated thousands of files and documents to start up WMC, his new competing business.

26.     Gray was terminated from CPS when CPS discovered his solicitation of Mr. Dessecker.  At the time of Gray's termination, however, CPS had no understanding of Gray's other illegal activities, including his stealing of CPS business information and misuse of CPS resources for his own benefit and the benefit of WMC.

27.     CPS would only later learn that prior to and immediately after being terminated from CPS, Gray accessed, copied, and transferred competitively sensitive documents created and maintained by CPS, through the use of USB devices and other electronic devices that remain in his possession.

28.     For example, on October 14, 2018, the day before he was terminated, Gray connected a portable hard drive or other electronic device (serial number 575839314137385236584431) (the "portable hard drive") to his CPS-issued laptop.  Gray

connected the portable hard drive to his CPS-issued laptop again on the morning of October 15, 2018, the day he was terminated.

29.     On September 27, 2018, Gray connected a USB or other electronic device (serial number BF823FF2) (the "BF USB") to his CPS-issued laptop.  Gray connected the BF USB to his CPS-issued laptop again on the morning of October 15, 2018, the day he was terminated.

30.     On June 1, 2018, Gray connected a USB or other electronic device (serial number 1405110433242329644005) (the "05 USB") to his CPS-issued laptop.  Gray connected the 05 USB to his CPS-issued laptop again on the morning of October 15, 2018, the day he was terminated.

31.     On September 25, 2018, Gray connected a USB or other electronic device (serial number 20052444120F04D2CC04) (the "04 USB") to his CPS-issued laptop.  Gray connected the 04 USB to his CPS-issued laptop again on the morning of October 15, 2018, the day he was terminated.

32.     Gray also downloaded and is in possession of emails and contacts lists, including lists of individuals he met and dealt with only in connection with his employment with CPS.

33.     Immediately after Gray's termination, Gray accessed and/or copied thousands of folders and documents maintained on CPS's secure network.  The folders that Gray accessed included information on large clients of CPS and also included confidential information on pricing proposals and offer letters.  There was no legitimate business reason for Gray to have done so.  Gray also deleted thousands of documents saved in folders on Gray's CPS-issued laptop without any legitimate business reason for Gray to have done so.

34.     Gray was terminated by CPS on October 15, 2018.  At the time Gray engaged in the computer activity described above, he was in the process of establishing WMC as a

competing business.  Indeed, Gray accessed and/or copied CPS folders and documents for the purpose of using them at WMC.

35.     Gray was fully aware that the files and documents he accessed, transferred and/or copied were CPS's confidential, proprietary information and trade secret information.  In addition to the Asset Recovery and Protection Program Policy in the Employee Handbook described herein, which Gray acknowledged and signed, CPS would frequently add a verbal confidentiality disclaimer during discussions at staff meetings regarding ongoing or potential projects.

36.     CPS does not know the full extent of Gray's misconduct.  Among other things, a forensic examination of the portable device, USB devices and WMC's computer systems will reveal the full extent of the misappropriation of CPS's confidential, proprietary and trade secret information.

**D.      WMC and Gray Attempt to Poach Prospective CPS Clients**

37.     Gray began soliciting potential clients for WMC while he was still employed with CPS.

38.     On October 11, 2018, Gray was soliciting CPS client prospect Nebraska Data Centers on behalf of WMC.  Nebraska Data Centers was seeking project management services for a data center upgrade project in Omaha, Nebraska for which CPS was being considered. Gray provided a response to a request for proposal ("RFP") which included, among other things, an overall budget for design, equipment procurement and construction and an overall schedule for the design, construction, commissioning and close-out periods.  Despite the fact that Gray was still employed by CPS, the response he submitted was explicitly provided on behalf of WMC.

39.     Upon information and belief, Defendants are using the information obtained from CPS in connection with soliciting additional clients for WMC.

40.     Defendants have engaged and continue to engage in the deliberate misappropriation of Plaintiff's trade secrets in order to convert Plaintiff's prospective customers quickly, without incurring the time and expense of developing the necessary expertise and goodwill, thereby competing unfairly with Plaintiff in the marketplace.  This illegal conduct is evidenced by the fact that WMC is involved in the development of a project implementing strikingly similar design characteristics used by CPS for a previous project.

41.     Defendants' misconduct was, and continues to be, wanton, willful, malicious and in reckless disregard of CPS and its rights.

**E.      The Information Defendants Took and Are Using Is
CPS's Trade Secret Proprietary and Confidential Information**

42.     CPS conducts extensive analyses and prepares substantial work product on behalf of clients.  CPS's analyses and documents are confidential and proprietary to it and its clients, which include, without limitation, requests for proposals ("RFPs"), responses to RFPs, engagement letters, pricing analyses, and strategic design implementations.

43.     CPS has also created, through extensive time and effort, substantial work product that is not specific to a particular client, but that is continuously used by CPS.  This information is confidential and proprietary to CPS and includes, without limitation, business development documents, prospect and client contact history records, pricing structures and budgets.

44.     At least some of the information described above constitute CPS's trade secrets.

45.     CPS developed this information over many years and it cannot be easily duplicated.

46.     CPS carefully safeguards such information by, among other things, maintaining computer security devices, protocols, and policies.  CPS is located in a secure building with a security desk.  Employees use key cards to pass through while visitors must check-in.  CPS's offices are locked.  Employees use keys to enter CPS's offices.  Visitors cannot enter without being granted access by CPS.

47.     To further protect such information, CPS's employees can only access CPS's computer network by using a secure login, username and password.  Employees' CPS-issued laptops require passwords and those passwords are configured to be regularly changed.  Also, CPS's network can only be accessed off-site by valid login credentials.

48.     Additionally, as set forth in the Employee Handbook, it is CPS's policy to prevent the "unauthorized disclosure of company or client sensitive data (including company private, competition sensitive and/or company confidential information) by transferring, publishing, using or disclosing such data other than is necessary in the ordinary course of business or as directed or authorized by Critical Project Services."  The Employee Handbook further states that the "security and protection of its assets, tangible and intangible, to be of primary importance to its continued growth, profitability and success.  Thus, the company's objectives must ensure that employees work together to prevent…disclosure and/or theft of company information."

49.     CPS has worked diligently, painstakingly, and at great expense to establish and cultivate strong personal and professional bonds with CPS's clients and prospects.  The value of these client relationships and CPS's reputation afforded by those relationships are immeasurable.  Any detrimental impact to CPS's reputation and relationships could have a devastating impact on CPS and its ability to maintain current business and obtain new business.

## COUNT I

### FEDERAL THEFT OF TRADE SECRETS
### (THE DEFEND TRADE SECRETS ACT, 18 U.S.C § 1836, *et seq.*)

50.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51.     CPS owns and possesses certain confidential, proprietary and trade secret information which constitutes a protectable trade secret.

52.     This confidential proprietary and trade secret information relates to a product and/or services used in, and/or intended for use in, interstate or foreign commerce.

53.     CPS has taken reasonable measures to keep such information secret and confidential.

54.     This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

55.     In violation of CPS's rights, Defendants have misappropriated CPS's trade secrets, and continue to use CPS's trade secrets, in various improper and unlawful ways as alleged herein. Defendants have derived actual economic value from its misappropriation and expect to continue to derive further value.

56.     Defendants have failed to return CPS's confidential, proprietary and trade secret information, and have attempted to conceal their theft and use of such information.  Upon information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit, and to CPS's detriment, CPS's trade secret information.

57.     CPS has been harmed and will continue to be irreparably harmed by Defendants' violation of The Defend Trade Secrets Act.  CPS is entitled to damages, in an amount to be determined at trial, and affirmative actions to protect CPS's trade secret information, including a seizure of all documents or information in Defendants' possession concerning or relating to CPS's trade secret information, as well as an award of exemplary damages and attorneys' fees.

### COUNT II

### THEFT OF TRADE SECRETS
**(Violation of the Virginia Uniform Trade Secrets Act - VA. CODE ANN. § 59.1-336)**

58.     Plaintiff repeats and re-alleges allegations in paragraphs 1 through 57 as if fully set forth herein.

59.     CPS's trade secret information includes, among other things, confidential customer lists, pricing information, and the design implementation of data centers.  This information is not public and is made available only to employees at CPS who have a need to know the information.

60.     CPS's information is therefore a trade secret under the Virginia Uniform Trade Secrets Act because the information constitutes "a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code Ann. § 59.1-336.

61.     CPS's trade secret information provides it with a competitive advantage, is not generally known and is not easily duplicated.  Moreover, this information cannot be readily ascertainable through legitimate means.

62.     Defendants are aware that such trade secret information was not properly obtained from CPS.

63.     The foregoing conduct of Defendants constitutes a misappropriation and misuse of CPS's confidential trade secret information, without authorization, in violation of the Virginia Uniform Trade Secret Act, § 59.1-336.

64.     As a direct and proximate result of Defendants' theft of CPS's trade secret information, CPS has suffered and is suffering damages in an amount to be determined at trial, as well as irreparable harm which cannot be fully remedied by damages and accordingly for which an injunction is sought to prevent Defendants from using CPS's trade secret information.  CPS is also entitled to punitive damages and attorneys' fees.

## COUNT III

## TORTIOUS INTERFERENCE WITH CONTRACT RELATIONS

65.     CPS alleges and incorporates the allegations in paragraphs 1 through 64 as if fully set forth herein.

66.     CPS maintains numerous advantageous business relationships with established customers.

67.     Defendants were and are aware of the advantageous business relationship which existed between CPS and its established customers.

68.     Upon information and belief, notwithstanding this knowledge of those advantageous business relations, Defendants willfully, intentionally, with malice and without justification or privilege, acted to induce customers of CPS to sever their ongoing business relations with CPS.

69.     Defendants acted improperly and without authorization by using CPS's trade secrets to directly compete and interfere with CPS's advantageous business relations.

70.     Defendants lack any legal justification or excuse to be using CPS's confidential, proprietary and trade secret information to interfere with CPS's business relationships with customers.

71.     But for Defendants' wrongful conduct, CPS would have maintained its relationships with its customers.

72.     CPS has suffered damages as the result of Defendants' wrongful conduct.

73.     Defendants' actions have been willful, intentional, and with reckless disregard for CPS's rights or the consequences, and Defendants have proximately caused substantial injury to CPS in an amount not yet determined.  CPS is entitled to recover from Defendants the full amount of the sums once they are determined.  CPS is further entitled to recover punitive damages and attorneys' fees in an amount to be determined at trial.

## COUNT IV

### BREACH OF FIDUCIARY DUTY AND FAITHLESS FIDUCIARY
### (Defendant Gray)

74.     Plaintiff repeats and re-alleges allegations in the paragraphs 1 through 73 as if fully set forth herein.

75.     As an employee of CPS, Gray owed a fiduciary duty of loyalty to CPS, which prohibited him from competing with CPS or founding a competing business during the course of his employment.  Gray's duty of loyalty also included a duty to act toward CPS honestly, fairly, and in good faith, to maintain the confidentiality of CPS's confidential, proprietary and trade secret information, and to refrain from any act or omission calculated or likely to injure CPS, or to act against any interest of CPS.

76.     CPS's duties required Gray to refrain from using CPS's confidential, proprietary and trade secret information to the detriment of CPS.

77.     Upon information and belief, Gray breached his fiduciary duty by accessing, copying and transferring CPS's confidential, proprietary and trade secret information and by using this information to the detriment of CPS.

78.     Gray's duty of loyalty additionally required him to refrain from soliciting CPS's clients and employees while he was still employed by CPS.  Gray breached this duty by actively soliciting CPS's employees and other clients on behalf of WMC while he was still employed by CPS.

79.     Gray's misconduct was intentional and degraded the fiduciary relationship they had with CPS.  As such, Gray acted as a faithless servant.

80.     As a direct and proximate cause of his breaches of fiduciary duty, CPS has been injured and will continue to sustain irreparable injury, the damages from which cannot yet be fully calculated.  Accordingly, CPS has suffered monetary damage in an amount to be determined at trial, plus attorneys' fees and costs incurred in connection with bringing this action and all costs associated with forensic examination of any servers, computers, hard drives, USB devices, or any other electronic storage device or electronic data.  CPS also seeks disgorgement of all profits made by Gray through his use of information from CPS.

81.     CPS also seeks the return of all compensation and other consideration paid to Gray during the period of his misconduct as a faithless fiduciary.

82.     CPS also seeks preliminary and permanent injunctive relief barring WMC from directly or indirectly using or disclosing the information taken from CPS, as well as requiring the return of all such information anything derived from such information.

## COUNT V

## CONVERSION
**(Defendant Gray)**

83.     Plaintiff repeats and re-alleges allegations in paragraphs 1 through 82 as if fully set forth herein.

84.     CPS maintains a policy of reimbursing its employees for reasonable expenses they incur while conducting CPS business in furtherance of its financial interests and serving CPS's clients.

85.     During his term of employment with CPS, Gray knowingly and intentionally met and solicited potential customers for WMC using travel accommodations that were either prospectively paid for or subsequently reimbursed by CPS.

86.     After his termination by CPS, Gray knowingly and intentionally met and solicited potential customers for WMC using travel accommodations that were paid for by CPS.

87.     Through his actions, Gray deprived CPS of its possession, dominion, and control over its own funds.

88.     Gray's actions have proximately caused substantial injury to CPS in an amount not yet determined.  CPS is entitled to recover the full amount of such sums once they are determined.  CPS is further entitled to recover punitive damages and attorneys' fees in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter the following relief:

A.     Enter judgment against Defendants for monetary damages to compensate CPS for the harms described above, in an amount to be proven at trial.

B.      Award Plaintiff punitive damages against Defendants.

C.      Enjoin Defendants against further unauthorized dissemination or use of CPS's confidential, proprietary and trade secret information.

D.      Enjoin Defendants against the use or dissemination of CPS's confidential, proprietary and trade secret information and require Defendants to destroy trade secret information currently in their possession.

E.      Award CPS its attorneys' fees and costs pursuant to The Defend Trade Secrets Act and the Virginia Uniform Trade Secrets Act.

F.      Grant CPS any other relief that the Court deems just and proper.

## JURY DEMAND

Wherefore Plaintiff demands a trial by jury on the within causes of action.

Dated: April 2, 2019                Respectfully submitted,


/s/ Joseph D. Wilson
Joseph D. Wilson (VSB # 43693)
Kelley Drye & Warren LLP
Washington Harbour, Suite 400
3050 K Street, N.W.
Washington, DC 20007
Telephone: 202.342.8400
Facsimile: 202.342.8451
Email:  jwilson@kelleydrye.com

Robert Steiner (*pro hac vice* to be submitted)
rsteiner@kelleydrye.com
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Telephone: 212.808.7800
Facsimile:  212.808.7897
Email:  rsteiner@kelleydrye.com

*Attorneys for Plaintiff*
*Critical Project Services LLC*